IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs July 24, 2019

**JONATHON D. BROWN v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Robertson County**
**No. 74CC2-2014-CR-453  Jill Bartee Ayers, Judge**

_____

**No. M2018-02055-CCA-R3-PC**

_____

Petitioner, Jonathon D. Brown, was convicted by a Robertson County jury of aggravated rape, especially aggravated kidnapping, and theft of property over the value of $1,000, for which he received an effective sentence of sixty years' incarceration.  Petitioner filed for post-conviction relief, which was denied following an evidentiary hearing.  Petitioner appeals, asserting that he received ineffective assistance of counsel based on trial counsel's failure to adequately meet with Petitioner given the severity of the charges and trial counsel's failure to secure a land survey to "further buttress his venue argument." After a thorough review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Joe R. Johnson, II, Springfield, Tennessee, for the appellant, Jonathon D. Brown.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Jason White, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural History**

To provide context for Petitioner's ineffective assistance of counsel claim, we will summarize the key evidence presented at trial.  A full summary of the testimony at trial can be found in this court's opinion on direct appeal.  *See State v. Jonathon D. Brown*,

No. M2015-02457-CCA-R3-CD, 2016 WL 7030488, at *1 (Tenn. Crim. App. Dec. 2, 2016), *no perm. app. filed*.

*Trial*

Jason Ghee, a Drug Interdiction Officer for the 18th Judicial District Drug Task Force, testified that on September 3, 2013, he was watching traffic drive north on I-65 and observed a green four-door Ford vehicle. *Id.* at *1. Officer Ghee "initiated [his] emergency equipment" when he observed that the driver was not wearing a seatbelt and that the vehicle "crossed the lane of traffic twice." *Id.* The green Ford vehicle exited I-65 onto Bethel Road and continued driving at speeds in "excess of ninety [miles per hour]." *Id.* Eventually the vehicle "left the roadway" and crashed when it was unable to navigate a sharp turn in Bethel Road. *Id.* After the vehicle crashed, Officer Ghee apprehended a black male wearing "[d]ark colored pants and [a] maroon shirt," who exited the passenger side of the vehicle. *Id.* Officer Ghee saw that the driver of the vehicle was another black male wearing "a white shirt and dark-colored pants and dark shoes." *Id.* Officer Ghee was unable to apprehend the driver but observed him exit the vehicle and run in a southeasterly direction towards the area of the victim's residence. *Id.*

Petitioner's friend, Jerome Inmon, testified that on September 3, 2013, he was in the car with Petitioner, who was driving the green Ford vehicle on I-65. *Id.* He explained that they were "spotted" by two police officers near Bethel Road. When the officers initiated a traffic stop, Petitioner did not stop the car because both Mr. Inmon and Petitioner believed that there were warrants out for their arrests. Mr. Inmon testified that he was arrested by police after Petitioner crashed the vehicle on Bethel Road. *Id.*

H.N. testified that she had lived on Bethel Road in Robertson County for approximately forty-five years with her children and now-deceased husband. *Id.* at *2. On September 3, 2013, H.N. was getting on her lawnmower when a man "jumped out" from behind two of H.N.'s other parked vehicles. *Id.* H.N. tried to run away from the assailant, but "he came up behind [her] and stopped [her]" by holding a knife to her neck. The assailant "pushed [her] back into the basement." *Id.* He told H.N. to be quiet, took her cars keys from her pants, and asked H.N. if she had any money. H.N. retrieved the two fifty-dollar bills from her car trunk and gave them to the assailant. The assailant also took off his shirt, opened the "passenger side door," and tossed his shirt into the car. *Id.* The assailant attempted to get into H.N.'s house, but H.N. told the assailant that she was locked out of her house and that her children were bringing her keys to the house around 3:30 p.m. *Id.*

After he was unable to get into the house, the assailant came back down the steps and pushed H.N. against the vehicle while standing behind her. The man "unzipped [her]

- 2 -

blue[ ]jeans and pulled them down." *Id*. The assailant then pushed H.N. "around to the hood of the car" as H.N. said, "I am so old, please don't do this to me." *Id*. The assailant responded that her age did not matter. H.N. then felt the assailant penetrate her vagina with his penis several times, causing her pain. Additionally, the assailant put a garbage bag in her mouth to gag her. The assailant then pushed H.N. over to a "yard chair" in the basement and tied her to the chair while she was still gagged with the garbage bag. *Id.* As the assailant "was getting ready to leave," H.N. was able to see his face. *Id.* H.N. saw that the assailant was a black male with a short, stocky build and that his hair was in dreadlocks. However, H.N. was unable to positively identify [Petitioner] as the assailant at trial. *Id.*

After the assailant tied her to the chair, he took a bottle of water and some rubber gloves that H.N. had worn earlier that day. Assailant put the gloves on before he left in her vehicle. *Id.* H.N. was eventually able to free her hands and call her son, daughter, and son-in-law. After her family members arrived, they helped H.N. to free herself from the chair and called the police. Family members gave authorities a description of H.N.'s car—a black 1990 Buick Regal with a "Titans mirrored license plate" on the front of the car—and the license plate number. *Id.* H.N. was taken to the hospital, where the emergency room doctor examined H.N. and performed a "rape kit." *Id.* While she was at the hospital, H.N. became nauseous. The doctor performed an arteriogram on H.N. and determined that she had suffered a "stress related heart attack." *Id*.

Dr. Duane Harrison, an expert in emergency medicine, testified that he was working in the emergency room of Hendersonville Medical Center on September 3, 2013, when he examined H.N. Dr. Harrison noted that H.N. had bruises around her wrists that "looked like constriction marks[.]" *Id*. at *3. Dr. Harrison stated that the bruises were fresh and were consistent with being "held or tied up[.]" *Id*. Dr. Harrison also performed "an in-depth vaginal exam" and found "[e]xternal bruising on [H.N.'s] external vagina." *Id*. Dr. Harrison also found that H.N. "had tearing on the right external lip[,] . . . bruising on both lips[,] . . . " and bruising on her clitoral hood. *Id*. Dr. Harrison testified that this bruising and tearing was consistent with "some type of trauma" and penetration. *Id*. Additionally, Dr. Harrison testified that H.N. had suffered a heart attack due to the stress of the earlier events. Dr. Harrison testified that these types of heart attacks are life-threatening and could cause organ failure. *Id*.

David Hall, a K-9 Trooper with the Kentucky State Police, testified that he was on patrol with Officer Jeremy Duvall on September 3, 2013, when he found a car matching the description of H.N.'s stolen vehicle at a Junior Food Store. *Id.* Trooper Hall testified that Petitioner came out of the store and began to walk towards the stolen vehicle. However, when a "marked Bowling Green police cruiser" pulled into the parking lot for an unrelated reason, Petitioner "turned around and walked back into the store." *Id*. At

that point, Trooper Hall "ran into the store and immediately detained [Petitioner]." *Id*. Trooper Hall then "patted [Petitioner] down for weapons and searched his pockets." *Id*. Trooper Hall found "various change and currency[,]" "a small amount of marijuana[,]" and "car keys that appeared to go to [the stolen vehicle]." *Id*. After Trooper Hall informed Petitioner of his *Miranda* rights, Petitioner agreed to speak with Trooper Hall and "stated that he had just bought the vehicle approximately one hour ago." *Id*. However, [Petitioner] could not tell Trooper Hall the seller's name, and he "stated he technically did not buy it legally[.]" *Id*.

Charly Castelbuono, a Special Agent Forensic Scientist in the Forensic Biology Unit of the TBI, testified that she examined the sexual assault kit with samples from H.N. *Id*. at *4. Agent Castelbuono testified that the kit contained a "known blood sample" from H.N. and buccal swabs from Petitioner. *Id*. at *4. Agent Castelbuono used Petitioner's buccal swabs to obtain a DNA profile of Petitioner for comparison purposes. Agent Castelbuono stated that she found DNA around the collar and armpits of the shirt found in H.N.'s car and that Petitioner was a major contributor of the DNA. *Id*.

Agent Castelbuono also examined Petitioner's underwear and found semen as well as non-semen DNA. *Id*. at *5. Agent Castelbuono testified that the partial DNA profile from the semen DNA matched Petitioner. Agent Castelbuono testified that H.N. could not be excluded as a contributor to the mixture of non-semen DNA. *Id*. Agent Castelbuono also examined the latex gloves found in H.N.'s car by swabbing the inside and the outside of the gloves. She stated that she found a partial DNA profile on the inside of the first glove that was consistent with a mixture of H.N.'s DNA and Petitioner's DNA. Agent Castelbuono testified that she found a partial DNA profile on the outside of the second glove that was consistent with a mixture of H.N.'s DNA and Petitioner's DNA. *Id*.

After the State rested its case, Chris Traughber testified that he was the property assessor for Robertson County. *Id*. Mr. Traughber identified a property record card for H.N.'s residence on Bethel Road, and he noted that the card indicated that the property was located in Sumner County. Mr. Traughber also identified an aerial photograph and a "GIS map" of the portion of Bethel Road where H.N.'s residence was located. *Id*. Mr. Traughber noted that the area was located in Sumner County. Mr. Traughber testified that H.N. would have paid her property taxes to Robertson County because there was an agreement between Sumner County and Robertson County for the properties in that area to pay taxes to Robertson County. On cross-examination, Mr. Traughber agreed that his testimony was based on maps from his office and that he did not survey the area of Bethel Road where H.N.'s property was located. *Id*.

In rebuttal, David Mark Palmer testified that he purchased H.N.'s property in September 2013. *Id*. Mr. Palmer identified a certified copy of the warranty deed to the property and noted that the warranty deed was registered with the Robertson County Register of Deeds. Mr. Palmer also testified that the warranty deed reflected that the property was located in Robertson County. Mr. Palmer stated that he was registered to vote based on the address of the property in question and that he voted in Robertson County. *Id*. Additionally, Mr. Palmer stated that he paid property taxes for the property in question to Robertson County. Lastly, Mr. Palmer testified that he changed the address on his driver's license to the property in question, and his driver's license was registered in Robertson County. *Id*.

Cynthia Elder, H.N.'s daughter, testified that she lived at the property in question on Bethel Road from the time she was in third grade until she was twenty-three years old. *Id*. at *2, 5. Ms. Elder testified that she attended Robertson County Schools from elementary through high school. Ms. Elder also noted that she registered her car in Robertson County and registered to vote in Robertson County. *Id*. at *5.

Based upon this evidence, Petitioner was convicted of aggravated rape, especially aggravated kidnapping, and theft of property over the value of $1,000, for which he received an effective sixty-year sentence. *Id*. This court affirmed Petitioner's convictions on direct appeal, and Petitioner did not seek further review. *Id.* at *8.

*Post-conviction Proceedings*

Petitioner filed a timely pro se petition for post-conviction relief. Following the appointment of counsel, an amended petition was filed.

At an evidentiary hearing, Petitioner recounted meeting with trial counsel three times before the start of trial. The first meeting was shortly after trial counsel was appointed to represent Petitioner, and the second meeting was a couple months following the first meeting. Petitioner testified that the third time they met was a couple days before trial and that trial counsel discussed trial strategy with Petitioner. Petitioner estimated that, in total, trial counsel met with him for less than three hours. Petitioner did not believe that the three meetings with trial counsel were adequate to form a strong defense. Petitioner stated that he provided trial counsel with names of witnesses that would be beneficial to Petitioner's defense. However, trial counsel failed to subpoena the witnesses, and only one witness, the mother of Petitioner's child, showed up to testify.

Petitioner recalled that the State's plea offer was for a twenty-five year sentence with sixty-percent release eligibility. Trial counsel informed Petitioner that, if he proceeded with trial, he could receive a sixty-year sentence. Petitioner admitted that trial

counsel advised him to take the State's plea offer, but Petitioner testified that he was not comfortable pleading guilty. He agreed that trial counsel discussed the State's evidence with him prior to trial. Petitioner contended that, while trial counsel explained that DNA evidence would be used against Petitioner, trial counsel did not adequately cross-examine Agent Castelbuono about the DNA evidence found on the gloves in the victim's car. Petitioner explained:

> I told [trial counsel] that I had been playing basketball that day. I had [taken] off a wife beater and was sweating, and I sat it at the bottom of the floorboard in a car that I had just bought. And the gloves were sitting down at the bottom of the car, so when the police [caught] me, they g[o]t the t-shirt and they g[o]t the gloves and that's how my DNA was inside the gloves.

Petitioner testified that trial counsel failed to raise this defense at trial.

Petitioner testified that trial counsel advised him not to testify at trial and that he followed counsel's advice. He stated, however, that he regretted his decision not to testify. Petitioner said that he had never worn braids or dreadlocks but that witnesses had described the assailant as having braids or dreadlocks. Petitioner stated that trial counsel never addressed this issue during trial. Petitioner asserted that Mr. Inmon originally identified someone else as the driver of the vehicle on September 3, 2013, and that trial counsel failed to question Mr. Inmon about his conflicting statements. Petitioner said that he did not find out about the conflicting statements until after trial. Petitioner further testified that trial counsel failed to subpoena or question the "white girl" who was in the vehicle with Mr. Inmon.

Petitioner acknowledged that trial counsel informed him that he was a career offender. Trial counsel also discussed what the victim would say during her testimony at trial, but he failed to inform Petitioner that the victim had gone to the hospital. Petitioner acknowledged that trial counsel told him that Petitioner's DNA was found on gloves in the victim's stolen car and that the victim's DNA was partially matched to DNA found in Petitioner's underwear. Petitioner admitted that trial counsel made him aware of the evidence the State planned on using against him and that trial counsel was going to challenge venue as a defense.

Trial counsel testified that he had practiced criminal defense for more than thirty years before being assigned Petitioner's case. As part of his initial investigation into the case, trial counsel went to the scene of the wreck. Trial counsel decided to use venue as a defense after looking at the location of the wreck and the property where the victim was attacked. Trial counsel met with the Tax Assessor for Robertson County, who located the

property card which listed the victim's property as located in Sumner County. Trial counsel recalled discussing the venue issue and the DNA evidence with Petitioner. Trial counsel stated that juries tended to accept DNA evidence, so there was little he could say while cross-examining Agent Castelbuono about the DNA findings.

Trial counsel could not recall how many times he met with Petitioner, but he testified that it was "at least three times." Trial counsel stated that he interviewed Mr. Inmon before trial and decided Mr. Inmon's testimony would not be helpful to Petitioner's defense because he identified Petitioner as the person driving the vehicle on September 3, 2013. Trial counsel attempted to locate the "white girl" in the vehicle with Mr. Inmon but stated he could not subpoena her to trial because she was in jail in Kentucky. Trial counsel told Petitioner that he had a right to testify, but he advised Petitioner not to testify because Petitioner had no evidence to back up his claim that he bought the victim's stolen car that day. Petitioner chose not to testify. Trial counsel stated that the only thing he would have done differently while working Petitioner's case was to hire a surveyor to further support the venue defense. He explained, however, that he did not pursue hiring a surveyor "because [he] thought that the Tax Assessor would be sufficient." Regarding the proof against Petitioner, trial counsel explained:

> [I]n theft of property cases, there is an inference that the person possessing it is the one that took it. So you had that inference within two hours of this car being stolen . . . [Petitioner] is found in possession of that property. That's a big problem to overcome and then . . . [H.N.'s] partial DNA had no business being . . . in [Petitioner's] underwear[.] How do you overcome that?

Following the hearing, the post-conviction court denied relief in a written order, finding that Petitioner failed to establish that he received ineffective assistance of counsel. This timely appeal follows.

## II. Analysis

On appeal, Petitioner asserts that he received ineffective assistance of counsel based on trial counsel's failure to adequately meet with Petitioner given the severity of the charges and to secure a land survey to "further buttress his venue argument." The State responds that the post-conviction court properly denied Petitioner's claim that he received ineffective assistance of counsel.

### A. Standard of Review

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

### B. Ineffective Assistance of Counsel

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded

of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

## 1. Failure to adequately meet with Petitioner

In this case, the post-conviction court found that the evidence did not support Petitioner's claim that trial counsel failed to adequately meet with him given the severity of the charges. The post-conviction court credited trial counsel's testimony and found that trial counsel was an experienced criminal defense attorney and that trial counsel "adequately met with and prepared [Petitioner] for trial and discussed with him a trial strategy that included a venue defense."

The record does not preponderate against the post-conviction court's findings. Although trial counsel could not recall exactly how many times he met with Petitioner, he testified that it was "at least three times." Trial counsel testified that he adequately discussed the evidence and trial strategy with Petitioner. Trial counsel stated that he had practiced criminal defense for more than thirty years before being assigned Petitioner's case. He explained that he decided to use venue as a defense after looking at the location of the wreck and the property where the victim was attacked. Trial counsel stated that he discussed the venue issue and the DNA evidence with Petitioner.

Petitioner agreed that trial counsel discussed trial strategy with him and that he knew trial counsel was going to challenge venue as a defense. Petitioner acknowledged that trial counsel discussed potential outcomes from a trial. Trial counsel informed Petitioner that he was a career offender and that he could receive a sixty-year sentence. Petitioner testified that trial counsel discussed the State's evidence with him prior to trial; trial counsel explained the DNA evidence and discussed what the victim's testimony would be.

Petitioner has not shown deficient performance on the part of trial counsel. Moreover, Petitioner has failed to establish a reasonable probability that the result of the proceeding would have been different if trial counsel had spent more time meeting with him, especially in light of the overwhelming evidence against Petitioner. *Id.* Petitioner is not entitled to relief on this claim.

## 2. Failure to secure a land survey

When asked during the evidentiary hearing, trial counsel stated that the only thing he would have done differently while working Petitioner's case was to hire a surveyor to further support the venue defense. He explained, however, that he did not pursue hiring a surveyor "because [he] thought that the Tax Assessor would be sufficient." In its order denying relief, the post-conviction court did not address this issue because Petitioner failed to raise the claim in either his pro se or amended petition. Because the issue was not before the post-conviction court and no ruling was rendered, we are precluded from review. Issues not raised in the post-conviction petition cannot be raised for the first time on appeal. *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004) ("[A]n issue raised for the first time on appeal is waived."). Petitioner has waived review of this issue.

Waiver notwithstanding, Petitioner failed to present testimony to the post-conviction court regarding such a land survey. In cases where a petitioner contends that trial counsel failed to present a witness in support of the petitioner's defense, the petitioner must present the witness at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). This court cannot speculate as to whether a land survey would have been favorable to the defense. As such, Petitioner failed to establish prejudice. *See id.* at 758.

## III. Conclusion

For the aforementioned reasons, we affirm the judgment of the post-conviction court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE